IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

|  |  |
|---|---|
| ECTO DEVELOPMENT CORPORATION <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. MARTIN CO. NV. INC, d/b/a <br> STAR HORSE PRODUCTS NV, INC. <br><br> Defendants. | Case No. 4: 10-CV-00691-NKL |

**ORDER**

Before the Court are a Motion for Partial Summary Judgment filed by Plaintiff ECTO Development Corporation [Doc. # 38] and a Motion for Summary Judgment filed by Defendant Andrew M. Martin Co. NV. Inc, d/b/a Star Horse Products NV, Inc ("Star Horse") [Doc. # 32]. For the following reasons, the Court grants Plaintiff ECTO's partial motion for summary judgment. Defendant Star Horse's Motion for Summary Judgment is denied in part and granted in part.

I.  Facts

The following facts are undisputed. On August 30, 2007, ECTO and Star Horse executed a "Memorandum of Intent," ("Memorandum") which states as follows:

1

This Memorandum of Intent sets forth the contemplated deal terms of a proposed agreement between [Star Horse]…and [ECTO] . . . .:

1.  ECTO has created and it owns data on a spot-on product for dogs which contains Nylar and Permethrin, that [Star Horse] desires to include in its Freedom45 brand spot-on for dogs and other private label spot-on for dogs. The data could be helpful to [Star Horse] in getting the EPA and other governmental agencies to approve its use of Nylar/Permethrin in its spot-on for dogs.

2.  ECTO agrees to provide all its extant data for Nylar/Permethrin spot-on application to dogs (EPA Reg. No. 67505-3) to [Star Horse] for an initial term of ten years beginning 9/1/07 with an option in [Star Horse] to extend for ten more years.

3.  [Star Horse] agrees to pay ECTO five percent of its net receipts for all its sales of dog spot-on that include Nylar, commencing with the first legally permitted sale by [Star Horse] of dog spot-on including Nylar.

4.  [Star Horse] guarantees ECTO that commissions in the first full calendar year of sales will not be less than $25,000 and will not be less than $50,000 in each full calendar year thereafter.

5.  [Star Horse]'s payments to ECTO shall be made on the tenth of each month (or the first business day following the tenth) based on the payments received during the prior month.

6.  During the term ECTO will not compete with or help others to compete with [Star Horse] by or through the use of ECTO's data for Nylar with Permethrin for spot-on application for dogs (EPA Reg. No. 67505-3).

    > NOTE: It is recognized that there may be one exception to Paragraph 6. ECTO reserves the option to allow use of ECTO's data by one other third party for sales of a Nylar/Permethrin spot-on for dogs, primarily to veterinarians. A final decision concerning this option must be determined prior to a final agreement being consummated between ECTO and [Star Horse].

7. The final agreement between ECTO and [Star Horse] will include a license from ECTO to [Star Horse] for the use of ECTO's United States Patent (No. 5,942,525) for "Spot Treatment of Animals with Pyiproxyfen and an Insecticide." ECTO shall, in ECTO's sole discretion, determine to defend or not defend the aforementioned patent against infringement by third parties.

8. This Memorandum shall bind the parties until a full length formal agreement is entered into and signed.

9. This Memorandum may be amended, changed, or modified only by a writing signed by the parties."

The Memorandum of Intent was signed by ECTO's President, Robert Pennington, and [Star Horse]'s President, Cliff Miller. [Doc.# 17-1 at 2, 3]. Both parties agree that the Memorandum was executed on August 30, 2007. [Doc. # 41 at 14; Doc. # 39 at 8]. There is no written document signed by both parties after the Memorandum of Intent was executed. [Doc. # 39 at 9; Doc.# 41 at 16].

After the agreement was signed, Star Horse gained EPA approval for a spot-on product for dogs containing Nylar and the product went to market during the first quarter of 2009. In 2010, its sales for the product were approximately $1.6 to $1.8 million. [Doc. # 30 at 12; Doc. # 41 at 18]. Nonetheless, Star Horse has not paid any commission for the data it received from ECTO.

ECTO has now sued Star Horse for breach of contract seeking damages in excess of $500,000.00 plus interest. ECTO also filed suit under the theories of unjust enrichment

and promissory estoppel, seeking the same damages as under its breach of contract suit. [Doc. # 17 at 2-5].

Pending before the Court is ECTO's Motion for Partial Summary Judgment. In it, ECTO asks the Court to rule that the Memorandum of Intent is enforceable. Defendant Star Horse has filed a Motion for Summary Judgment on all of ECTO's claim alleging that 1) the Memorandum is unenforceable, 2) as a result of its unenforceability, the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") mandates the arbitration of Ecto's promissory estoppel and unjust enrichment claims, 3) Ecto's promissory estoppel and unjust enrichment claims fail on the merits and 4) assuming that the Court does find the Memorandum of Intent enforceable, ECTO is only entitled to present damages.

## II. Discussion

### A. Enforceability of the Memorandum of Intent

The required elements of a contract under Missouri law are "(1) competency of the parties to contract; (2) [a proper] subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation." *Olathe Millwork Co. V. Dulin*, 189 S.W.3d 199 (Mo. Ct. App. 2006). In support of its Motion for Summary Judgment, Star Horse argues that ECTO and Star Horse did not manifest an intent in the Memorandum of Intent that it be a binding contract; rather, the Memorandum contemplated a future final agreement. Star Horse also argues that paragraphs 6 and 7 of the Memorandum of Intent are so indefinite that they render the whole agreement unenforceable.

A central canon of contract construction is that the court looks first to the plain language of the agreement to determine the intent of the parties. *TAP Pharmaceutical Products Inc., v. State Board of Pharmacy*, 238 S.W.3d 140, 143 (Mo. 2007). Only if there is an ambiguity within the four corners of the document will the court consider extrinsic evidence. *Erwin v. City of Palmyra*, 119 S.W.3d 582, 585 (Mo. Ct. App. 2003). A contract will be ambiguous only if it can be reasonably construed to have more than one meaning. *Id.*

Mutual assent will only be found when a contract's essential terms are sufficiently definite so that the court can give them an exact meaning through application of "general principles of law applied with common sense and in the light of experience." *Property Assessment Review, Inc. v. Greater Mo. Builders*, Inc., 260 S.W.3d 841, 846 (Mo.App. E.D.2008). Courts favor a determination that an agreement is sufficiently definite so as to give reasonable effect to the intentions of the parties as long as it can be ascertained. *Id.* The court will read the terms of a contract as a whole to ascertain the intent of the parties, using the "plain, ordinary and usual meaning" of the terms. *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003).

To determine if there is mutual assent, the Court first looks at whether the Memorandum on its face manifests an offer, acceptance and consideration, the necessary elements to constitute a binding contract. The plain language of paragraph 2 indicates an offer from ECTO to Star Horse in which "ECTO agrees to provide all its extant data for

5

Nylar/Permethrin spot-on application to dogs...to [Star Horse] for an initial term of ten years beginning 9/1/07." [Doc. # 17-1, ¶ 2]. In return, in paragraph 3, Star Horse "agrees to pay ECTO five percent of its net receipts for all its sales of dog spot-on that include Nylar, commencing with the first legally permitted sale by [Star Horse] of dog spot-on including Nylar." [Doc.#17 at 2]. Both paragraphs lay out the necessary terms to constitute offers, including the dates of performance and the precise subject matter involved. The amount of payment is clearly ascertainable, as five percent of profits from a specific type of product. Both parties' acceptance of the agreement is evidenced by their signatures and the execution of the Memorandum August 30, 2007, as well as ECTO's commencement of performance two days later. In addition to a clear offer and acceptance by both parties, the Memorandum contains adequate consideration on both sides, as ECTO agrees to supply use of its data in exchange for ten years of payments by Star Horse.

Star Horse argues however, that the provisions of paragraph 2 and 3 cannot constitute a valid contract because 1) the parties drafted the Memorandum only as an attempt at preliminary negotiations and 2) the terms within paragraphs 6 and 7 cause the Memorandum to fail for indefiniteness. As evidence of the preliminary nature of the contract, Star Horse points to words such as "contemplated deal terms," and "proposed agreement," along with three references to a future "final agreement." However, this argument is unpersuasive for several reasons. First, paragraph 8 explicitly states that the Memorandum "shall bind the parties until a full length formal agreement is entered into

and signed." [Doc.# 17-1]. It was clearly the intention of the parties that the terms of the agreement would bind both sides until some future written agreement altered those terms. Further, performance by ECTO was to begin two days after execution of the Memorandum. [Doc.# 17-1, ¶2]. An agreement which calls for an immediate commencement of one party's performance while also explicitly binding the parties to its terms is strongly indicative of intent to be bound. *See Property Assessment Review, Inc. v. Greater Missouri Builders, Inc.*, 260 S.W.3d 841, 846 (Mo. Ct. App. 2008) (courts are reluctant to invalidate written agreements for indefiniteness particularly when the other party has performed).

Missouri courts have recognized that if the essential terms of an agreement are present, the contract will not fail because some nonessential terms are left for further negotiations. *See Gubernik v. HAN-DEEPAK*, 668 S.W.2d 574, 575 (Mo. Ct. App. 1984). This is precisely the situation here. All the essential terms are present concerning ECTO's obligation to provide data and Star Horse's obligation to pay. The fact that other unrelated provisions were to be negotiated in the future and incorporated into a final agreement cannot render meaningless the clear language in paragraph 8 that the Memorandum of Intent was to bind the parties until a formal agreement was signed. *City of Harrisonville v. Public Water Supply Dist. No. 9 of Cass County*, 49 S.W.3d 225, 231 (Mo. Ct. App. 2001). (Courts construe each contract term as to avoid leaving other terms meaningless.). Rather,

it was the unresolved issues between the parties that were to be finalized in the future – not the terms related to the exchange of data.

Moreover, the purposes of the license and non-compete option are sufficiently distinct from the purpose behind the use of ECTO's data that it is unlikely that the same consideration would be intended to apply to all three. On the face of the contract, the purpose of the data for Star Horse appears to be that it "could be helpful to [Star Horse] in getting the EPA…to approve the use of Nylar… ." [Doc. # 17-1 ¶ 3]. The benefit of this data to Star Horse would thus begin immediately upon receipt of the data, as Star Horse would then be able to use the data to potentially support its EPA application. Thus, when a product is later brought to market, Star Horse would have already received the benefit of its bargain, through receipt of the data. However, the principal function of the license appears on the face of the Memorandum to be to obtain use of a patent for a specific formulation of a product developed by ECTO. Just because the parties failed to agree to a license in the future would not preclude Star Horse from using ECTO's data, gaining EPA approval, and bringing another type of Nylar dog spot-on to market, thus triggering the payment obligations plainly listed in paragraph 3. Therefore, it is implausible that the license was intended to be a benefit in exchange for Star Horse's obligation to pay ECTO a percentage of its sales. *See* 1 Williston on Contracts § 4:31 (4th ed.) ("[I]f the undetermined matter does not preclude performance of the remainder of the contract and is

of comparatively little importance, the uncertain promise may be left entirely unperformed and the remainder of the contract enforced.").

Similarly, the presence or absence of an additional non-compete option does not plausibly relate to the consideration provided by Star Horse in paragraph 3. The chief purpose of an exclusivity clause would be to enhance the value of whatever product Star Horse eventually put on the market by withholding the benefits of ECTO's data from competitors. ECTO's reservation of the right to make an exception to that exclusive relationship might affect the value of whatever product Star Horse put on the market. However, the benefits or drawbacks of the non-compete option would largely occur after Star Horse's product already had gone to market, and the payment obligations had already been triggered by the terms of paragraph 3. Thus, the failure to resolve this minor issue would be immaterial to ECTO and Star Horse's other obligations in the Memorandum of Intent.

An additional argument by Star Horse is that the Memorandum is unenforceable on the grounds that paragraph 1 fails to reference Star Horse's product type with sufficient specificity. Paragraph 1 of the Memorandum discusses data owned by ECTO that Star Horse "desires to include in its Freedom45 brand spot-on for dogs and other private label spot-on for dogs." [Doc. # 17-1, ¶ 1]. Star Horse states that the "agreement fails to specify whether the product description for "extant data" pertains to StarHorse's EPA registration for the "Nylar and Permethrin 45" product or to the "Nylar and Permethrin 50"

product." [Doc.# 41 at 14]. However, this argument is immaterial. ECTO's obligation in the Memorandum is provided in paragraph 2: to provide "all its extant data for Nylar/Permethrin spot-on application to dogs" to Star Horse. In exchange for this promise, Star Horse agrees to pay ECTO a percentage of all its sales of dog spot-on which includes Nylar. While Star Horse may have wanted to describe in paragraph 1 the general reasons why it wanted ECTO's data, Star Horse's binding obligation is found in paragraph 3 and does not depend on the specific brand for which Star Horse uses the data.

Star Horse also argues that inclusion of the phrase "[t]he data could be helpful" in paragraph 1 indicates a lack of mutuality of obligation, as it allegedly fails to bind the ECTO to an enforceable promise while binding Star Horse to certain financial obligations. However, Star Horse misidentifies the promise which binds ECTO in the Memorandum. The promise which is enforceable is that ECTO "agrees to provide" the data to Star Horse. Whether the data is actually useful in helping Star Horse bring a product to market is immaterial in determining the Memorandum's enforceability. Furthermore, the consideration provided is not illusory as Star Horse argues. The receipt of ECTO's data does represent something of value regardless of the eventual outcome of Star Horse's EPA application.[1] *See e.g. Moore v. Seabaugh*, 684 S.W.2d 492, 496 (Mo. Ct. App. 1984) ("Even slight consideration is sufficient to support a promise.").

---

[1] The parties do not dispute the fact that in citing or submitting the data of another company to the EPA, Star Horse is not required to conduct its own animal safety study. This ability to forgo its own study is more than sufficient consideration under Missouri law, which does not generally look into the adequacy of consideration in simple contract actions in the absence of fraud. *See e.g. Haretuer v. Klocke,* 709 S.W.2d 138 (Mo. Ct. App. 1986).

As the Memorandum is not ambiguous on its face, the Court does not need to consider Star Horse's argument that the parties' deal regarding the Nylar data represented a "complex transaction that would typically be covered by a comprehensive written agreement." [Doc. # 35 at 17].

For the above reasons, the Court grants ECTO's motion for partial summary judgment as to the existence of an enforceable agreement between ECTO and Star Horse. Because the Court has ruled that the Memorandum of Intent is an enforceable agreement, the Court denies Star Horse's motion for summary judgment on Counts I and II with respect to that issue, as well as to the related arbitration requirement under FIFRA of Counts II and III. Further, the Court denies Star Horse's motion for summary judgment with respect to the unjust enrichment claim. It is undisputed that Star Horse used the data. This is sufficient as a matter of law to confer a benefit.[2]

### B. Future Damages

Pursuant to Federal Rule of Civil Procedure 56(g), the Court now turns to Star Horse's argument that ECTO is currently entitled only to present damages and must bring successive claims to recover future damages. The Court agrees that Missouri law does not support ECTO's ability to recover at the present time for future damages. When a "contract is still in existence, each time the defendant fails to perform in accordance with its provisions is a separate violation of its terms and gives rise to a new cause of action."

---

[2] Whether this claim is viable or relevant in light of the Court's ruling on ECTO's Motion for Partial Summary Judgment is left for another day.

11

*Finley v. St. John's Mercy Medical Center*, 958 S.W.2d 593, 595. (Mo. Ct. App. 1998). Whether a contract still exists depends on whether there has been a partial or total breach. It is a general rule of contract law that when the "only remaining duties of performance are those of the party in breach and are for the payment of money in installments not related to one another, his breach by non-performance as to less than the whole, whether or not accompanied or followed by a repudiation, does not give rise to a claim for damages for total breach." Restatement (Second) of Contracts § 243 (3)(1981).

ECTO and Star Horse agreed in the Memorandum that Star Horse would meet its financial obligations in distinct installments over a 10-year period.[3] Despite failing to pay for the first two years, Star Horse would still have the capacity to make future payments based on its profits which accrue for the remainder of the ten year term. Because a total breach has not occurred to terminate the contract, ECTO cannot recover damages on the installments in which performance of payment has not yet come due.

The cases cited by ECTO, *McGee v. St. Joseph Belt Ry.*, and *Farmers' Elec. Coop. Inc. v. Mo. Dep't of Corr.* are unpersuasive. The *McGee* ruling, concerning an employment contract, actually supports *Finley*, stating that "[t]he failure of defendant to call plaintiff to work in accordance with the contract was not a total breach of the contract, putting an end to it, so that plaintiff could have sued for the whole damages suffered by him at the time he brought the first suit." 110 S.W.2d 389, 391-92 (Mo. Ct. App. 1937).

---

[3]Neither party disputes that Star Horse's payments will occur over a 10-year period and will consist each year of 5% of Star Horse's profits for dog spot-on products containing Nylar, or a minimum of $50,000 a year after the first full calendar year. [Doc. # 32 at 21; Doc. # 40 at 16].

12

The McGee court stated that the contract was still existing and that each day the defendant failed to "call plaintiff in accordance with [contractual] provisions was a separate violation of its terms." *Id.* at 392. As stated above, Star Horse's contract with ECTO also does not represent a total breach, and each future failure to make payments also represents a distinct cause of action. The other main case cited by ECTO is not applicable to the present issue. *Farmers' Elec. Coop* involves a plaintiff suing for the future profits it will lose as a result of defendant's alleged breach which prevented plaintiff's performance. 59 S.W.3d 520 (Mo. 2001). By contrast, the present case concerns distinct incidents of future damages arising from Defendant Star Horse's future failure to perform, and is thus more closely related to the facts in *Finley*, which concerned the defendant's continuing duty to make disability payments to plaintiff as part of a long-term disability contract. The fact that here, ECTO's damages are measured by reference to a percentage of Star Horse's profits does not convert this case into one requiring a lost profits analysis.

The Court thus rules that ECTO can only recover for present damages.

### III. Conclusion

Accordingly, it is hereby ORDERED that Plaintiff ECTO's Motion for Partial Summary Judgement [Doc. # 38] is GRANTED. In addition, Defendant Star Horse's Motion for Summary Judgment [Doc. # 32] is GRANTED with respect to the issue of future damages and otherwise DENIED.

s/ Nanette K. Laughrey
_____  NANETTE K. LAUGHREY
                                                        United States District Judge_____

Dated:  September 16, 2011
Jefferson City, Missouri